UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

W.W. GAY, *et al.*, as Trustees of the
Jacksonville Plumbers & Pipefitters
Local Union 234 Fringe Benefit Funds,

                    Plaintiffs,

v.                                                    CASE NO. 3:09-cv-1002-J-JBT

BRENCORP, INC., a Georgia
corporation,

                    Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, who are trustees of the Jacksonville Plumbers & Pipefitters Local

Union 234 ("Local 234") Fringe Benefit Funds, which include the Health and Welfare

Fund and Pension Fund (collectively, "the Fund"), brought this action under Sections

502(a)(3), 502(g)(2), and 515 of the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. §§ 1132(a)(3), 1132(g)(2), 1145, as well as Section 301(a) of

the Labor Management Relations Act of 1947 ("LMRA"), as amended, 29 U.S.C. §

185(a). (Doc. 1 at 1-5.) The Court has jurisdiction pursuant to these federal statutes

in conjunction with 28 U.S.C. § 1331.

Plaintiffs assert what is essentially a breach-of-contract claim against

Defendant, Brencorp, Inc. ("Brencorp"). Plaintiffs allege that Brencorp was bound

by the terms of a collective bargaining agreement ("CBA"), and breached the CBA

by performing work within the scope and territory defined in the CBA without using

Local 234's labor to perform the work and not making contributions to the Fund

based on that work.  (Doc. 1 at 1-5.)[1]  On October 24, 2011, the Court held a bench trial solely on the issue of whether Defendant was bound by the CBA (Doc. 60), and this order follows.

## I.    Issues and Summary of Decision

In determining whether Defendant was bound by the CBA during the time period in question, the Court must decide one or more of the following subsidiary issues: (a) whether Kenneth Welchel ("Welchel"), one of Defendant's employees who in fact signed the CBA on behalf of Brencorp, had actual authority to do so; (b) whether Welchel had apparent authority to do so; and (c) whether Defendant ratified by conduct the CBA signed by Welchel.  If the Court determines any one of these issues in Plaintiffs' favor, Defendant is bound by the CBA.  The Court does decide in Plaintiffs' favor on the first issue, actual authority, and although not necessary to the decision, also on the third issue, ratification.  Given these conclusions, the Court need not decide whether Welchel had apparent authority as well.

Additionally, the Court must decide the merits of Defendant's affirmative defenses, which include the following: (i) Defendant's obligations under the CBA never accrued because of the failure of a condition precedent contained in the CBA; (ii) Defendant satisfied and performed its obligations under the CBA; and (iii)

_____

[1] There were actually two CBAs for the period in question.  The first expired on August 31, 2007, just a few weeks after it was signed and Defendant's job began.  (Doc. 54 at 3.)  The second ran from September 1, 2007, through August 31, 2010.  (*Id.*)  For ease of reference, the Court is referring to them collectively as "the CBA," unless otherwise specified.

assuming Defendant entered into the CBA, it did so under a mistaken understanding of the terms of the CBA. The Court finds in Plaintiffs' favor on all of Defendant's affirmative defenses.[2]

Thus, Plaintiffs are entitled to an accounting as requested in the Complaint (Doc. 1). The Court entered a separate order scheduling the remainder of this case. (*See* Doc. 66.)

## II. Findings of Fact[3]

The parties stipulated to certain facts in their Joint Pre-Trial Statement. (Doc. 54 at 2-3.) The Court accepts all of these facts, which are set forth below, as admitted.

For the remainder of the Court's findings of fact, the Court relies on the testimony presented at the October 24, 2011 bench trial (*see* Doc. 65 (to be cited as "Tr. [page #]")), as well as the exhibits, including deposition testimony, admitted into evidence at that trial (to be cited as "Ex. [#] at [page #]"). Plaintiff called five witnesses: Jimmy Johnson, Curtis K. Tharpe, David Edward Mass, Kenneth Welchel, and Ronnie Andrews. Plaintiff also admitted thirty-nine exhibits into evidence, which included the transcripts of the depositions of Ted Brennan, Laurie

---

[2] The Court must also decide an evidentiary objection raised by Plaintiffs at trial, and taken under advisement, regarding parol evidence.

[3] To the extent that any of the findings of fact represent mixed questions of law and fact or conclusions of law, the Court adopts them as such.

Ward, and Kenneth Welchel.[4]  Defendant called two witnesses: Ted Brennan and

Laurie Ward.

## A.    Stipulated Facts

a.    The Jacksonville Plumbers and Pipefitters Local Union 234 is a labor union located in Jacksonville, Florida and its members perform plumbing and pipefitting work.

b.    Plaintiffs are the Trustees of Local 234's Pension Fund and its Health and Welfare Fund.

c.    The Defendant, Brencorp, Inc., is a Georgia corporation located in Cartersville, Georgia.

d.    Brencorp does industrial contracting work which often requires it to employ labor that performs the type of work done by members of Local 234.

e.    On July 31, 2007, Ted Brennan ["Brennan"], President of Brencorp, Inc., sent a letter to Local 234 pursuant to which he stated that Brencorp would agree to pay employees from Local 234 per the breakdown of Local 234's Collective Bargaining Agreement ("CBA") for a piping modification project that was being performed at Anheuser-Busch Jacksonville Brewery[.]

f.    On August 2, 2007, Jimmy Johnson, then Business Manager for Local 234, sent a letter to Mr. Brennan, along with two copies of Local 234's CBA, and asked Mr. Brennan to sign the CBA.

g.    On August 3, 2007, Kenneth Welchel signed a CBA ["the First CBA"] with Local 234, and signed the drug testing authorization letter.

h.    The [First] CBA signed by Mr. Welchel on August [3], 2007[5]

---

[4] Prior to any testimony, Plaintiff's Exhibits 1 through 28 and 30 through 37 were admitted into evidence without objection.  (Tr. 25.)  There is no Exhibit 29.  (*Id.*)  Additionally, during Plaintiff's case in chief, Plaintiff's Exhibits 38, 39, and 40, which are the transcripts of the depositions of Ted Brennan, Laurie Ward, and Kenneth Welchel, respectively, were admitted into evidence without objection.  (Tr. 132-33.)  Defendant did not admit any additional exhibits into evidence.  However, Plaintiff's Exhibits 2, 25, 26, and 28 were separately admitted as Defendant's Exhibits 1 through 4.  (Tr. 141.)  For ease of reference, all exhibits will be cited simply as "Ex. [#] at [page #]," based on Plaintiffs' numbering.

[5] Although this portion of the parties' Joint Pre-Trial Statement reads, "August 7, 2007" (Doc. 54 at 3), the parties stipulated at trial that this was a typographical error and

(continued...)

expired on August 31, 2007.

i.　　On September 1, 2007, Mr. Welchel signed a new CBA ["the Second CBA"] for the period from September 1, 2007, through August 31, 2010.

j.　　Local 234 provided labor for the Anheuser-Busch project for the period from August, 2007 until June, 2008.

k.　　Brencorp submitted reports on the labor and paid contributions to the Fringe Benefit Funds for all such labor.

(Doc. 54 at 2-3.)

## B.　　Remainder of Findings of Fact

Brencorp is an industrial contracting company located in Cartersville, Georgia that does millwright, pipefitting, and rigging work. (Tr. 142.) Ted Brennan is Brencorp's president and sole executive officer. (Tr. 142-43.) Kenneth Welchel, a union member of Local 72 of the Plumbers, Steamfitters & Service Technicians in Atlanta, Georgia, began working for Brencorp in November 2005. (Tr. 102; Ex. 40 at 5-6.) During the time in question, Welchel's title at Brencorp was "[P]roject [S]upervisor." (Tr. 147.)

Brencorp bid on and was awarded a job at the Jacksonville Anheuser-Busch ("A-B") facility, which was scheduled to begin on August 6, 2007, a Monday. (Tr. 193.) As Project Supervisor, Welchel began reviewing the plans and preparing for this job in early July 2007. (Tr. 106.) These preparations lasted several weeks, and during this time, Welchel and Brennan discussed and concluded that they would use local union labor for the job. (*Id.*)

---

(...continued)
the correct date is August 3, 2007. (Tr. 27.)

On or about July 31, 2007, the Tuesday before the job was scheduled to begin, Welchel came to Local 234's union hall in Jacksonville, Florida to discuss using its labor on the job. (Tr. 38.) Welchel met with Jimmy Johnson ("Johnson"), who was the business manager for Local 234, and told Johnson that he would be "run[ning] the job for Brencorp." (Tr. 108.) Welchel further told Johnson that Brencorp was interested in using Local 234's labor but wanted to enter into only a one-job labor contract—i.e., for the one job Brencorp had been awarded at the Jacksonville A-B facility. (Tr. 38-39, 108.) Johnson told Welchel that Local 234 would agree only to the standard three-year CBA that it had with all the other contractors. (Tr. 34, 39, 108-10.) Welchel said that he would have to discuss Local 234's position with Ted Brennan, president of Brencorp. (Tr. 39.) Before leaving, Welchel gave Johnson one of his business cards, which reflected his title as Project Supervisor for Brencorp. (Tr. 103, 107.) After leaving the union hall, Welchel relayed to Brennan Local 234's position that it would not agree to a one-job contract and would agree only to its standard three-year CBA. (Tr. 110.)

On August 1, 2007, Brennan faxed the following letter, dated July 31, 2007, to Ronnie Andrews, who was Local 234's business agent at the time:

> Please except [sic] this letter as our commitment with Plumbers & Steamfitters Local 234.
>
> We agree to hire and pay all wages and benefits for any employees that Local 234 sends to us per the breakdown of your Collective Bargaining Agreement and Pay Scale. All benefits will be paid to the appropriate fund office.

> Terms and conditions of this agreement will be to perform piping work at the Anheuser-Busch Jacksonville Brewery for the piping work associated with the Piping Modification Project No. 4890 BP 300. Upon completion of the above said project, this agreement will self terminate.
>
> I hope that this satisfies your concerns and I look forward to a successful project.

(Ex. 2.)

Johnson read the above letter, and on August 2, 2007, sent Brennan by overnight mail two signed copies of the Local's standard CBA and a letter, which stated the following:

> Please find enclosed two copies of Local 234's [CBA], wage and fringe sheet and a letter confirming the obligation of Brencorp, Inc. to pay the drug testing cost of $45.00 per employee tested for your company.
>
> I hope you will find the [CBA] acceptable. We have no intention of trying to obligate Brencorp, Inc. to anything different than our local contractors agree to.
>
> Please sign and return to us one of the [CBAs] and the drug testing authorization letter.
>
> I do look forward to working with you.

(Tr. 41-45; Ex. 3.) Brennan received this letter and the accompanying documents on August 3, 2007, the Friday before the job was scheduled to start. (Tr. 158, 173, 175.) Brennan was fully aware that the CBA included a three-year term and was not limited to the A-B job. (Tr. 175-76.)

That same day, Johnson called Brennan and they had a 41-minute conversation. (Tr. 40-43; Ex. 31.) During this conversation, Brennan said that he

was interested in signing a one-job agreement and Johnson said that Local 234 was interested in signing only the standard three-year CBA. (Tr. 40-41.) At no time during that conversation did Johnson indicate that the Local would agree to a one-job agreement. (Tr. 43.)

With Brencorp's project at the A-B facility scheduled to begin the following Monday (Tr. 193), Welchel told Brennan that he would not run the job with nonunion people (Tr. 111). Brennan told Welchel, "I'm not signing the [CBA]. You go [expletive deleted] sign it if you want to." (Tr. 180.) Welchel believed that Brennan had authorized him to sign the CBA. (Tr. 111.)[6] Moreover, given the circumstances, that belief was reasonable, as more fully discussed below. Pursuant to Brennan's statements, late in the day on August 3, 2007, Welchel went to Local 234's union hall and signed the First CBA. (Tr. 111-13; Doc. 54 at 3.) It is unclear whether, after signing the First CBA, Welchel explicitly told Brennan that he had done so. (*See* Tr. 111-13.) However, given all of the circumstances, the Court finds that Brennan was well aware that Welchel had signed the First CBA.

While testifying at trial, Brennan made several statements that suggest he thinks that his personal signature is required for Brencorp to be bound to a contract. For instance, when asked, "Did you have any reason to open [the First CBA] and

---

[6] When asked, "did you believe that Mr. Brennan had authorized you to go sign the agreement," Welchel responded, "Yeah. I would not have went [sic] down there on my own if I hadn't[,] or communicated with him about it. I would have just came [sic] back to Cartersville." (Tr. 111.)

look to see if it was signed," Brennan answered, "No, because . . . unless I open up the page and signed it, it wouldn't be signed." (Tr. 192.) Further, on several occasions, he freely admitted telling Welchel to sign the First CBA while emphasizing that he was never going to do so personally. (*See, e.g.*, Tr. 180, 187-88, 191.) Assuming that Brennan did believe that his personal signature was required, as set forth below in the Court's discussion of agency law, that understanding is incorrect.

Given that Brennan's authorization to Welchel included an expletive (Tr. 180) and that, at one point in time, he threw the First CBA across his office (Tr. 184-85), it appears that Brennan was frustrated with his negotiations with Local 234 and the circumstances. However, Brennan's frustration does not change the facts that he told Welchel he could sign the First CBA, Welchel believed that Brennan had authorized him to do so, and that belief was reasonable under the circumstances, as discussed herein. Thus, contrary to Defendant's argument, Brennan's frustration does not support its position that Welchel lacked authority to sign the First CBA.

On August 6, 2007, Brencorp began work at the A-B facility with Local 234's labor. (Tr. 192-93.) The three-year term of the First CBA was set to expire on August 31, 2007. Because Johnson believed Brennan was at the A-B job site, he sent the Second CBA, effective September 1, 2007 through August 31, 2010, to the job site for signature. (Tr. 58.) After receiving the Second CBA, Brennan and Welchel discussed it. In this regard, Welchel originally testified that he did not recall

Brennan specifically telling him to sign the Second CBA, and that "[i]t didn't really seem necessary." (Tr. 115.) However, after being refreshed with his prior deposition testimony, Welchel testified that Brennan had told him, "sign it if you want to" (*id.*), or something to that effect. The Court finds that the facts are as contained in Welchel's deposition—that Brennan did expressly tell Welchel to sign the Second CBA. However, as discussed below, even if Brennan did not expressly say anything to Welchel about signing the Second CBA, he impliedly authorized Welchel to sign it based upon him telling Welchel he could sign the First CBA and the surrounding circumstances. Welchel did in fact sign the Second CBA, and Brennan was aware that he had done so. (Tr. 116-17.)

For the duration of the job at the A-B facility, which lasted from August 2007 through June 2008, Brencorp used labor provided by Local 234. (Doc. 54 at 3.) Brencorp submitted reports on the labor and paid contributions to the Fund for all such labor, in compliance with the terms of the CBA. (*Id.*)

## C. Credibility of the Witnesses

A credibility determination is appropriate on at least two factual disputes: (1) whether Brennan explicitly told Welchel that he could sign the Second CBA and (2) whether Brennan was contemporaneously aware when Welchel signed the two CBAs.

For the following reasons, the Court finds that Brennan did tell Welchel that he could sign the Second CBA. Welchel testified that Brennan told him he could

sign the Second CBA (Tr. 115), and the Court generally finds Welchel's testimony more credible than Brennan's.  At trial, Brennan admitted that he told Welchel he could sign the First CBA.  (Tr. 180.)  However, at his deposition, Brennan testified that he did not "recall having any conversations with Ken Welchel regarding signing the [CBA] with 234."  (Ex. 38 at 16-17.)  Moreover, Brennan did not deny that he told Welchel he could sign the Second CBA; he testified merely that he did not recall having any discussions with Welchel about Welchel signing the Second CBA.  (Tr. 187-88.)  Thus, to the extent that Brennan's testimony is inconsistent with the Court's finding on this dispute, the Court finds that testimony not credible.[7]

The Court also finds that Brennan was aware that Welchel signed the two CBAs at the time the signings occurred or soon thereafter.  Brennan testified that he was not aware that Welchel had signed either of the CBAs until after the job at the A-B facility was completed.  (Tr. 188.)  However, this is inconsistent with Welchel's testimony (Tr. 116-17), which the Court finds more credible.  Moreover, it is inconsistent with the entirety of the circumstances, including the fact that Brennan knew that, if the CBAs had not been signed, Local 234 would not have provided labor for the A-B job.  At the very least, Brennan was willfully blind to Welchel's signing of the CBA, which is tantamount to knowledge.  *See Hallman v. State*, 633 So. 2d 1116, 1117 (Fla. Dist. Ct. App. 1994) ("The willful blindness doctrine is 'that

---

[7] Moreover, as indicated elsewhere herein, even if Brennan did not explicitly tell Welchel that he could sign the Second CBA, he authorized Welchel to do so by his conduct.

if a party has his suspicion aroused but then deliberately omits to make further inquiries, because he wishes to remain in ignorance, he is deemed to have knowledge.'" (citations omitted)); *see also Williams v. Obstfeld*, 314 F.3d 1270, 1278 (11th Cir. 2002) ("Under the doctrine of willful blindness or deliberate ignorance, which is used more often in the criminal context than in civil cases, knowledge can be imputed to a party who knows of a high probability of illegal conduct and purposely contrives to avoid learning of it." (citation omitted)).

In discounting the credibility of Brennan's testimony, the Court also considers the material inconsistencies between his deposition and trial testimony (*see, e.g.*, Tr. 175-178). For example, in regard to one of the most crucial factual issues in the case—whether Brennan told Welchel he could sign the First CBA, Brennan testified at his deposition that he did not recall having any conversations on this topic, only to finally admit at trial that he did in fact tell Welchel he could sign the First CBA. Another example is, at his deposition, Brennan stated that he did not "recall having any discussions with Jimmy Johnson regarding Brencorp signing the [CBA]" (Ex. 38 at 15), but at trial, he admitted that this "[p]robably was not an accurate response" (Tr. 176).

III.    **Conclusions of Law**[8]

A.    **Source of Law**

"As under the National Labor Relations Act, our resolution of this contract-formation dispute is guided by the general common law of contracts.  In light of the important federal policy favoring the existence of collective-bargaining agreements, however, contract law may be given a liberal interpretation." *E. Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 1546, 1550 (11th Cir. 1988) (citations omitted).  "It is beyond dispute that the substantive law to be applied in suits under section 301(a) [of the LMRA] 'is federal law, which courts must fashion from the policy of our national labor laws.'" *Turner v. Am. Fed'n of Teachers Local 1565*, 138 F.3d 878, 882 (11th Cir. 1998) (citation omitted).  However, "state law, if compatible with the purpose of [§] 301, may be resorted to in order to find the rule that will best effectuate the federal policy." *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 457 (1957).  Additionally, "[w]hen applying agency principles to federal statutes, 'the Restatement (Second) of Agency is a useful beginning point for a discussion of general agency principles.'" *Ramos-Barrientos v. Bland*, 2011 WL 5080363, at *12 (11th Cir. Oct. 27, 2011) (citation omitted).

B.    **Actual Authority**

"Actual authority exists when a principal gives an agent the authority to act on

---

[8] To the extent that any of the following conclusions of law may represent mixed questions of law and fact or findings of fact, the Court adopts them as such.

its behalf.  Actual authority also exists when the agent reasonably believes that the principal has bestowed him with the power to bind the principal.  The authority can be expressly or impliedly conferred."  *Granoff v. Clarendon Nat. Ins. Co.*, 2007 WL 646973, at *4 (S.D. Fla. Feb 27, 2007).  Citing the Restatement of Agency, the Eleventh Circuit recently provided the following discussion of actual authority:

> Under general principles of agency law, "authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him." . . . . [A]n agent is authorized to do, and to do only, what it is reasonable for him to infer that the principal desires him to do in the light of the principal's manifestations and the facts as he knows or should know them at the time he acts."  Authority often "can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account."  "Acquiescence by the principal in conduct of an agent whose previously conferred authorization reasonably might include it, indicates that the conduct was authorized; if clearly not included in the authorization, acquiescence in it indicates affirmance."

*Ramos-Barrientos*, 2011 WL 5080363, at *12 (citing RESTATEMENT (SECOND) OF AGENCY §§ 7, 26, 33, 43(1) (1958); RESTATEMENT (THIRD) OF AGENCY §§ 2.01, 2.02, 3.01 (2006)).

Applying this well-settled law to the facts previously found, the Court concludes that Welchel had actual authority to sign the First CBA.  The most significant facts supporting this conclusion include that Brennan explicitly told Welchel that he could sign the First CBA (Tr. 180), that Welchel believed that Brennan had authorized him to sign the First CBA (Tr. 111), and that his belief was

reasonable in light of the circumstances, including that it was clear that Local 234 would not provide union labor for a job imminently approaching unless the agreement was signed. Moreover, Brennan was aware of and acquiesced in Welchel's signing of the First CBA.[9] Therefore, Welchel had actual authority to sign the First CBA on Defendant's behalf.

Similarly, the Court also concludes that Welchel had actual authority to sign the Second CBA. On August 31, 2007, just a few weeks into the job, the First CBA was set to expire, and so Johnson sent over two copies of the Second CBA to the job site for signature. (Tr. 58.) Brennan and Welchel discussed the Second CBA, and Brennan again told Welchel, "sign it if you want to" (Tr. 115), or something similar. Welchel believed that Brennan had authorized him to sign the Second CBA, and given Brennan's statement and the surrounding circumstances, that belief was reasonable. These circumstances included Welchel's awareness that he had previously told Brennan that he would not run the job with non-union labor, that Brennan told him he could sign the First CBA several weeks earlier, and that, if the Second CBA was not signed, Local 234 would pull its labor off the job. Moreover, there was no evidence that Defendant had any arrangements for or intentions of securing labor from an alternative source at the time the Second CBA was signed. Welchel in fact signed the Second CBA, and Brennan was aware that he had done

---

[9] As indicated below, the Court concludes that Brennan not only acquiesced in the signing of both CBAs, he ratified those acts as well.

so. (Tr. 116-17.) Therefore, the Court holds that Welchel had express actual authority to sign the Second CBA.

Alternatively, even if Brennan did not expressly tell Welchel he could sign the Second CBA, Brennan authorized Welchel to do so by his conduct in the context of the surrounding circumstances. This conduct included his awareness of and acquiescence in Welchel's signing of the Second CBA. As discussed below in the context of ratification, Brennan knowingly accepted benefits under the Second CBA, and never took any steps to repudiate Welchel's signing of that CBA (or the first one). Thus, whether by express words or by conduct, Welchel had actual authority to sign the Second CBA.[10]

## C. Ratification

"Ratification, as applied to the law of agency, is the adoption or affirmance by a principal of the acts of his agent, either expressly, as by written act, or impliedly, as by acceptance of the benefits of the contract." *Spurrier v. United Bank*, 359 So. 2d 908, 910 (Fla. Dist. Ct. App. 1978) (citation omitted); *see also Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1355 (11th Cir. 2011) ("'Ratification of an agreement occurs where a person expressly or impliedly adopts an act or contract entered into in his or her behalf by another without authority.'" (quoting *Deutsche*

_____

[10] The Court's conclusions on the issue of actual authority are consistent with the federal policy favoring CBAs. *See E. Air Lines*, 861 F.2d at 1550. However, given the well-settled law of agency set forth above, the Court need not rely on this federal policy in reaching these conclusions.

*Credit Corp. v. Peninger*, 603 So. 2d 57, 58 (Fla. Dist. Ct. App. 1992))). "The principal must have full knowledge of the initially unauthorized agents' conduct and approve of the conduct." *Lama*, 633 F.3d at 1355 (citing *Frankenmuth Mut. Ins. Co. v. Magaha*, 769 So. 2d 1012, 1021-22 (Fla. 2000)). On this issue, the Restatement reads as follows:

> The receipt by a purported principal, with knowledge of the facts, of something to which he would not be entitled unless an act purported to be done from him were affirmed, and to which he makes no claim except through such act, constitutes an affirmance unless at the time of such receipt he repudiates the act. If he repudiates the act, his receipt of benefits constitutes an affirmance at the election of the other party to the transaction.

RESTATEMENT (SECOND) OF AGENCY § 98 (1958).

As discussed above, the Court finds that Welchel had actual authority to sign the CBA and thereby bind Defendant to the terms contained therein. However, even assuming that he lacked such authority, the Court finds that Defendant, through Brennan's conduct, ratified the CBA. Brennan knowingly accepted benefits under the CBA, i.e., union labor, that he knew he could not obtain except through execution of the CBA. Further, he never repudiated the CBAs until after the A-B job was over and he had knowingly accepted those benefits. Additionally, he was contemporaneously aware that Welchel signed both the First and Second CBAs. He fully understood that those agreements included a three-year term and were not limited to the A-B job. Moreover, for the duration of the A-B job, Brencorp submitted reports on all labor and paid contributions to the Fund for all such labor, in

compliance with the terms of the CBA. (Doc. 54 at 3.) For these reasons, even had Welchel lacked actual authority to sign the CBA on Brencorp's behalf, Defendant ratified the CBA.

### D. Affirmative Defenses

#### 1. Condition Precedent as to Creation of Legal Obligation

Defendant argues that "[a] condition precedent for the creation of Defendant's legal obligations under the [CBAs] did not occur in that there was no 'written application to' and/or 'approval of the Union' for the Defendant to become a party to the [CBAs] as expressly required by the terms of the [CBAs]." (Doc. 25 at 2.) Defendant raises this affirmative defense based on the following provision contained in the CBAs: "Other Employers may become a party to this Agreement and the bargaining unit upon written application to and approval by the Union, which shall promptly notify the Association of Employers becoming a party to this Agreement." (Ex. 5 at 1; Ex. 6 at 1.) For the following reasons, the Court rejects this affirmative defense.

As a general matter, "[i]n light of the important federal policy favoring the existence of collective-bargaining agreements, . . . contract law may be given a liberal interpretation." *E. Air Lines*, 861 F.2d at 1550 (citations omitted).

"A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." RESTATEMENT (SECOND) OF CONTRACTS § 224 (1981). As recognized by another

district court,

> the law appears to be well-settled in Florida and elsewhere that conditions precedent must be explicit and unambiguous: "Provisions of a contract will only be considered conditions precedent . . . where the express wording of the disputed provision conditions formation of a contract and[/]or performance of the contract on the completion of the conditions."

*Solymar Invs., Ltd. v. Banco Santander S.A.*, 2011 WL 1790116, at *7 (S.D. Fla. Mar. 14, 2011) (quoting *Gunderson v. Sch. Dist. of Hillsborough Cnty.*, 937 So. 2d 777, 779 (Fla. Dist. Ct. App. 2006)).  Although "[n]o particular form of language is necessary to make an event a condition, . . . such words as 'on condition that,' 'provided that' and 'if' are often used for this purpose."  RESTATEMENT (SECOND) OF CONTRACTS § 226 cmt. a (1981).

Here, the subject provision does not expressly condition formation or performance on the alleged "condition precedent."  To the contrary, it merely states that employers "*may* become a party to [the CBA] and the bargaining unit upon written application to and approval by the Union . . . ."  (Ex. 5 at 1; Ex. 6 at 1 (emphasis added).)  It does not preclude the possibility that an employer might become party to the CBA by other less formal means, which apparently was the practice of Local 234 (*see, e.g.*, Tr. 45-46).  Accordingly, the Court holds that the subject provision was not a condition precedent.

In addition, under the circumstances of this case, the Court holds that the affirmative defense of failure of a condition precedent is not available against

Plaintiffs. Because Plaintiffs are trustees of pension and welfare funds, they are "like a holder in due course in commercial law and thus entitled to enforce the writing without regard to the understandings or defenses applicable to the original parties." *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1103 (3d Cir. 1996) (citation omitted); *see also Trs. of the Laborers Local Union #800 Health & Welfare Trust Fund v. Pump House, Inc.*, 821 F.2d 566, 568 (11th Cir. 1987) (holding that the defense of fraud in the inducement is unavailable as a defense to a suit by employee benefit fund trustees to collect delinquent contributions).

Further, even assuming that the subject CBA provision is a condition precedent and that it is available against Plaintiffs, the Court excuses the condition precedent's non-occurrence. "To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." RESTATEMENT (SECOND) OF CONTRACTS § 229 (1981). "'[F]orfeiture' is used to refer to the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance on the expectation of that exchange." *Id.* at § 229 cmt. b.

The process apparently contemplated by the subject provision, i.e., a written application by Brencorp and approval by Local 234, was not material to the agreed exchange between these parties. To the contrary, as evidenced by both parties'

performance of the CBA without incident as to the A-B job, it had absolutely nothing to do with the consideration to be received by either party; it was simply a formality. Further, the Court's refusal to excuse the condition precedent's non-occurrence would result in disproportionate forfeiture by Local 234. As discussed above, Local 234 made a calculated decision not to accept Brencorp's offer to enter into a one-job agreement. It provided labor to Brencorp for the A-B job only because Welchel signed the CBA, binding Brencorp to the full three-year term and not limited to a single job. It would be a disproportionate forfeiture for Local 234 not to receive what it bargained for.[11] Accordingly, even assuming the subject CBA provision is a condition precedent and such a defense is available against Plaintiffs, the Court excuses the condition precedent's non-occurrence.

Moreover, it is arguable that Brencorp's written correspondence with Local 234 sufficed as a "written application" and it is clear that the union, through Johnson, approved Brencorp's signing of the CBA. Both parties certainly adhered to the CBA as to the A-B job, indicating that the parties considered the supposed "condition precedent" either satisfied or immaterial. Thus, even assuming that the subject provision was a condition precedent and that such a defense was available against Plaintiffs, and even if the Court were not willing to excuse its non-occurrence, the Court concludes that the subject condition precedent did, in fact, occur.

---

[11] Moreover, to accept Defendant's argument would mean that Brencorp was not even obligated to pay contributions to the Fund based on Local 234's labor provided during the A-B job.

Finally, the Court applies the general law regarding estoppel and waiver to conclude that Defendant is barred from asserting the subject affirmative defense.

> One such application of the doctrine of estoppel . . . is present where a person attempts to change his position after representing a contrary position to another who reasonably relied upon the representation and who would suffer substantial injury if the inconsistent position were permitted to be successfully asserted. The representation may be made by words or conduct and, where there is a duty to speak, failure to do so can be a representation relied upon by a party claiming estoppel.

*Head v. Lane*, 495 So. 2d 821, 824 (Fla. Dist. Ct. App. 1986) (citations omitted).

"Another form of estoppel occurs where a person attempts to repudiate the obligations and validity of a transaction after accepting the benefits resulting from it." *Id.* Further, "'[a]s a general principle of law, the doctrine of waiver encompasses not only the intentional or voluntary relinquishment of a known right, but also conduct that warrants an inference of the relinquishment of a known right.'" *Russ v. Silbiger*, 988 So. 2d 80, 81 (Fla. Dist. Ct. App. 2008) (citation omitted). Applying this law to the findings of fact contained herein, including Defendant's acceptance of benefits under the CBA, the Court holds that Defendant is estopped from asserting the affirmative defense of failure of a condition precedent and that Defendant waived that defense by its conduct.

In summary, for each of the above independent grounds, the Court rejects the subject affirmative defense raised by Defendant.

### 2. Satisfaction and Performance

Defendant argues that it satisfied and performed its obligations under whatever agreement it entered into with Plaintiffs. (Doc. 25 at 2.)

The primary issue in this case is *which* agreement Defendant is bound to. Defendant's position is that it was bound only to a one-job agreement as presented in its letter of July 31, 2007. As discussed above, the Court rejects this argument. While it is undisputed that Defendant fully performed its obligations with respect to the one job at the A-B facility, Defendant produced no evidence that it performed or satisfied its obligations under the CBA with respect to any other work done during the term of the CBA. Therefore, the Court rejects this affirmative defense.

### 3. Avoidance of Contract Based on Mistake

Finally, Defendant argues that, assuming it entered into the CBA, it did so under a mistaken understanding of the CBA's terms—i.e., that it was limited in scope and duration to the one job at the A-B facility. (Doc. 25 at 3.) This defense plainly has no merit. The term of the CBA is clear. (Ex. 6.) Further, Brennan fully understood that the CBA included a three-year term and was not limited to the A-B job.

### E. Plaintiffs' Parol Evidence Objection

At trial, Plaintiffs made a standing objection to the admission of parol evidence to vary the terms of the CBA. The Court took that objection under advisement. The Court now overrules that objection. The Court admitted all of the subject evidence

because it was relevant to whether Defendant was bound by the CBA, and not for the purpose of considering whether it altered any of the terms thereof.

## IV.    Conclusion

Based on the foregoing, the Court concludes that Defendant was bound by the CBA.   Furthermore, the Court rejects each of the affirmative defenses raised by Defendant.   Therefore, Plaintiffs are entitled to an accounting as requested in the Complaint (Doc. 1).

**DONE AND ORDERED** at Jacksonville, Florida, on January 19, 2012.

JOEL B. TOOMEY
United States Magistrate Judge

Copies to:    Counsel of Record